OSCN Found Document:TMX CONSTRUCTION v. REVOLUTION PIPELINE

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 TMX CONSTRUCTION v. REVOLUTION PIPELINE
2023 OK CIV APP 39
Case Number: 119812
Decided: 12/07/2022
Mandate Issued: 10/26/2023
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II

Cite as: 2023 OK CIV APP 39, __ P.3d __

 

TMX CONSTRUCTION, Plaintiff/Appellee,
v.
REVOLUTION PIPELINE, LLC, Defendant/Appellant.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE RICHARD C. OGDEN, TRIAL JUDGE

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS

Lambert D. Dunn, Jr., Javier Hernandez, Oklahoma City, Oklahoma, for Plaintiff/Appellee

Justin T. Hiersche, BLANEY TWEEDY TIPTON & HIERSCHE, PLLC, Oklahoma City, Oklahoma, for Defendant/Appellant

JANE P. WISEMAN, PRESIDING JUDGE:

¶1 Defendant Revolution Pipeline, LLC, appeals the trial court's summary judgment granted to Plaintiff TMX Construction. We consider this appeal according to Supreme Court Rule 1.36, 12 O.S.2021, ch. 15, app. 1, without appellate briefing. After review, we reverse the decision of the trial court and remand for further proceedings.

FACTS AND PROCEDURAL BACKGROUND

¶2 Revolution and TMX entered into an agreement for TMX to install a water pipeline for Revolution. On completion of the project, Revolution was to pay TMX the agreed-upon amount. TMX sent invoices to Revolution for payment of the completed projects, some of which were paid. TMX, however, asserts some of the invoices amounting to $158,362.63 remain unpaid and outstanding. TMX brought this action against Revolution to recover the unpaid balance.

¶3 In its motion for summary judgment, TMX argued judgment should be entered in its favor because Revolution admits an outstanding balance is owed to TMX, there are no material disputed fact issues, and Revolution has no available defenses. TMX asserts that "[a]fter inquiring about payment, via email, [Revolution] discovered that it had sent the funds via wire transfer to another party as part of an email scam." TMX states Revolution "fell victim to an advanced email scheme" and "had been the victim of previous technological scams and attacks" and "took no steps or action to recover the funds that were sent to a non-party." (Emphasis omitted.) TMX urges Revolution has failed to satisfy the debt owed to it and has no breach of contract defense. TMX sought judgment under the contract in the amount of $172,700.

¶4 Revolution responded that material disputed facts exist precluding summary judgment, asserting that it was not the victim of the scam but rather TMX was the victim and that judgment in favor of TMX is "improper because [TMX] was in the best position to avoid the fraud but failed to exercise ordinary care, which contributed to the phishing email's success in diverting funds paid by [Revolution]."

¶5 After a hearing and considering the parties' arguments and briefs, the trial court granted TMX's motion for summary judgment against Revolution in the amount of $158,362.63.

¶6 Revolution appeals.

STANDARD OF REVIEW

¶7 "Summary judgment is properly granted when there are no disputed questions of material fact and the moving party is entitled to judgment as a matter of law." Institute for Responsible Alcohol Pol'y v. State ex rel. Alcoholic Beverage Laws Enf't Comm'n, 2020 OK 5, ¶ 10, 457 P.3d 1050. "An appeal on summary judgment comes to this Court as a de novo review, as the matter presents only questions of law, not fact." Id. We assume "'plenary[,] independent and non-deferential authority to reexamine a trial court's legal rulings.'" Id. (quoting Kluver v. Weatherford Hosp. Auth., 1993 OK 85, ¶ 14, 859 P.2d 1081).

ANALYSIS

¶8 Revolution argues in part that the trial court erred in granting TMX's motion for summary judgment because "a factual dispute remains regarding which party was in the best position to avoid the [t]ransfer, and therefore which party failed to exercise ordinary care and should bear the loss." We address this issue first.

¶9 Revolution disputes TMX's "undisputed material facts" numbers 4, 6, 7, and 8 which we quote here:

4. That the Defendant Revolution Pipeline failed to compensate and/or pay the Plaintiff TMX the amounts owed; (See the Affidavit of Lucas Martinez attached as Exhibit 1).

[RESPONSE] Fact No. 4: Defendant denies that it failed to compensate and/or pay Plaintiff the amounts owed and affirmatively states that it paid Plaintiff pursuant to the instructions it received via email from an email address it reasonably believed to be affiliated with Plaintiff. Plaintiff was aware that Defendant intended to make payment of the outstanding invoices via the instructions in the email and failed to take reasonable steps to prevent the Defendant from doing the same. (See, Exhibit "6" to Plaintiff's Motion for Summary Judgment at pg. 3).
. . . .

6. The Defendant became the victim of a phishing email and rerouted the money owed to TMX to a third-party. (See Emails from Revolution Pipeline to TMX attached as Exhibit 6); (See Funds Transfer sheet attached as Exhibit 7) and (See Deposition of Joshua Richardson P. 18-19 attached as Exhibit 8).

[RESPONSE] Fact No. 6: Defendant denies that it was the victim of a computer hack or hacked email. (See, Exhibit "1" - Unsworn Declaration of Josh Richardson at Paragraph 2). Plaintiff, not Defendant, was the victim of a phishing email attack as described in Plaintiff's emails to Defendant. (See, Exhibit "6" to Plaintiff's Motion for Summary Judgment at pgs. 3, 8-9). It was based on Plaintiff's failure to act after having knowledge of the phishing email that the funds intended for Plaintiff were intercepted by a third party.

(Emphasis omitted.) TMX's fact number 7 states that Revolution had previously been a victim of a scam "in the same manner and failed to prevent it. (See Deposition of Joshua Richardson P. 18-19, 23 attached as Exhibit 8)." (Emphasis omitted.) Although Revolution admitted it had previously been the victim of "an email phishing scam," it denies that scam is relevant to this summary judgment proceeding. Revolution states, "In the prior phishing scam, the fraudulent emails were sent from Defendant's email. (See, Exhibit "1" at Paragraph 3)." (Emphasis added.) But in contrast in this case, Revolution argues that third-party hackers infiltrated TMX's system enabling them to receive emails from TMX's customers. Revolution asserts that "Plaintiff's representatives unequivocally admitted in its emails to Defendant that Plaintiff (not Defendant) was the victim of the hack (See, Proposition A, page 4 below; See also, Exhibit "6" to Plaintiff's Motion for Summary Judgment at pgs. 3, 8-9), thus making Plaintiff the clear victim of the phishing scam." (Emphasis omitted). Because TMX's email system was hacked, Revolution denies having the duty to prevent the scam and criticizes TMX for knowing about the scam prior to Revolution's payment and failing to "act reasonably to avoid being defrauded."

¶10 In its fact number 8, TMX states Revolution failed to mitigate its damages by attempting to recover the stolen monies by contacting the bank receiving the monies. Revolution denies it had any obligation to recover the monies it believed were properly paid to TMX and also denies it had any further duty to cancel or investigate the issue. Revolution further contends:

Plaintiff admitted in email to Defendant on November 7, 2019 at 2:34 p.m. that Plaintiff was aware of the issue of the phishing email. This email never reached Defendant as it was intercepted as part of the same email attack. (See, Exhibit "6" to Plaintiff's Motion for Summary Judgment at pgs. 3, 8-9). Defendant did not make the wire transfers until eight (8) days later, giving Plaintiff plenty of time to take reasonable steps to ensure that Defendant received the message regarding the email attack, such as making a phone call to the Defendant.

(Emphasis omitted.)

¶11 "Where the movant presents evidence in a summary judgment motion showing no controversy as to material facts, the burden of proof shifts to the opposing party to present evidence justifying trial on the issue." Gurley- Rodgers v. Brookhaven West Condo. Owners' Ass'n, Inc., 2011 OK CIV APP 64, ¶ 8, 258 P.3d 1190. "'A party resisting a motion for summary judgment may not rely on allegations of its pleadings or bald contentions that facts exist to defeat the motion for summary judgment.'" West v. Jane Phillips Mem'l Med. Ctr., 2017 OK CIV APP 52, ¶ 9, 404 P.3d 898 (quoting Roberson v. Waltner, 2005 OK CIV APP 15, ¶ 8, 108 P.3d 567).

A party opposing a motion for summary judgment must show "the reasonable probability, something beyond a mere contention, that the opposing party will be able to produce competent, admissible evidence at the time of trial which might reasonably persuade the trier of fact in his [or her] favor on the issue in dispute."

Keeler v. GMAC Glob. Relocation Servs., 2009 OK CIV APP 88, ¶ 11, 223 P.3d 1024 (quoting Davis v. Leitner, 1989 OK 146, ¶ 15, 782 P.2d 924).

¶12 In considering whether a motion for summary judgment should be denied, the Supreme Court in Residential Funding Real Estate Holdings, LLC v. Adams, 2012 OK 49, ¶ 17, 279 P.3d 788, held:

A motion for summary judgment should be denied if the facts concerning any issue raised by the pleadings, as set forth in the depositions, admissions, answers to interrogatories, and affidavits on file in the case when such motion is filed, and as set forth in affidavits thereafter filed in opposition to such motion and meeting the requirements of said Rule 13, are conflicting, or if reasonable [people], in the exercise of a fair and impartial judgment, might reach different conclusions, from undisputed facts concerning any issue as set forth in such instruments.

(Emphasis added.) The Supreme Court further explained that "[t]he focus in summary process is not on the facts which might be proven at trial (i.e., the legal sufficiency of evidence that could be adduced), but rather on whether the tendered material in the record reveals only undisputed material facts supporting but a single inference that favors the movant's quest for relief." Id.

¶13 The central question to be resolved is who should bear the loss attributable to an unidentified hacker who illegally intercepted and stole the funds meant for TMX. From mid-October 2019 through mid-November 2019, the parties were emailing each other about the remaining payment owed to TMX. The emails at issue during this timeframe, although lengthy, paint a better picture of what occurred between Josh Richardson (Revolution's representative) and the hacker posing as Cole Huber (TMX's Chief Operations Officer):

November 4, 2019 at 9:25 am from Cole Huber: "Josh, Kindly advise on when the overdue amount will be cleared, We have an ongoing audit that requires all further payments to be arranged using our subsidiary offshore account as informed by our financial department until the period is over. We have to keep our cash flow steady and would ask for your kind cooperation, Please advise."

November 5, 2019 at 4:55 pm from Josh Richardson: "Dustin, please reach out to [C]ole today and let me know exactly how to proceed so we can get this resolved for both parties[.]"

November 6, 2019 at 9:43 am from Cole Huber: "Dustin, Kindly advise your next payment schedule date and the amount to be paid including the short pay for invoice number 1786, Also as advised previously that all further payments henceforth will be received with our subsidiary offshore account to be provided. Thank you!"

November 6, 2019 at 9:18 pm from Josh Richardson: "We will be cutting checks on Thursday afternoon for mail on Friday."

November 6, 2019 at 3:09 pm from Cole Huber: "Josh, Be advised that we can't process check payment due to the ongoing audit, All further remittance will be received via wire transfer until the period of the audit is completed as instructed by our finance department."

November 6, 2019 at 10:10 pm from Josh Richardson: "Cole, let's have quick call tomorrow to make sure I am taking care of what you need."

November 7, 2019 at 9:57 am from Cole Huber: "Josh, Please provide an update in regards to the payment, As advised I'll provide our wiring instructions to you."

November 7, 2019 at 5:05 pm from Josh Richardson: "Send me your wiring instructions and I'll send the remainder of the outstanding invoice today."

November 7, 2019 at 10:13 am from Cole Huber: "Josh, We have a short pay of 4779.13 for invoice number 1786 as well, Please confirm the total going out today in order to have our finance department keep an eye out for it. Will send our instructions to you, Kindly advise."

November 7, 2019 at 9:16 pm from Josh Richardson: "Cole that's what I was referencing earlier, -do I need to wire you $4,779.13 for the remainder of invoice 1786 today?"

November 7, 2019, at 2:33 pm from Cole Huber: "Not at all, You need to wire the short payment with the other payment as well. I only asked what's the total amount that will be wired."

November 7, 2019 at 9:40 pm from Josh Richardson: "Cole, call me after 3:45. If I get everything I need to make sure I get you what you need I can have a wire hit your bank tomorrow morning."

November 7, 2019 at 2:56 pm from Cole Huber: "Josh, I'll have the whole details provided to you for the wire transfer via email, I need you to please indicate the amount to be wired along with the short pay amount before I provide you with our wiring instructions. I won't be able to schedule a call for today, Let me know the details you need via email.

November 11, 2019 at 8:24 pm from Josh Richardson: "I approved wire transfers on Friday, just waiting on the information from you, wanted to let you know im not sweating you."

November 13, 2019 at 6:48 am from Cole Huber: "Josh, Please provide an update in regards to my previous email sent yesterday, Thank you."

November 13, 2019 at 2:01 pm from Josh Richardson: "I will get that to you today."

November 13, 2019 at 7:39 am from Cole Huber: "Kindly do so, Our accounting department needs the payment details in order to update our audit record for the year ending. I'll provide our wiring information as soon as I get the payment schedule from you."

November 13, 2019 at 4:58 pm from Josh Richardson: "Cole, our team is sending it your way."

November 13, 2019 at 10:16 am from Cole Huber: "Kindly advise if [I] need to send our wiring information to you directly or to your team."

November 13, 2019 at 8:04 pm from Josh Richardson: "You can send it to me."

November 14, 2019 at 9:02 am from Cole Huber: "Josh, Attached is our wiring instructions for the outstanding due invoices, Kindly have the payment wired today and advise accordingly. I'll have our finance department be on the lookout for any incomings today."

November 14, 2019 at 6:51 pm from Josh Richardson: "Can you send me the email Jessica sent detailing the invoices we are paying? I cant find it."

November 14, 2019 at 11:58 am from Cole Huber: "See the below email Jessica sent yesterday detailing the invoices: . . . ."

November 14, 2019 at 12:11 pm from Josh Richardson: "Which ones am I supposed to wire to you today? These? $125,009.63[,] 4,779.13[,] 120,230.50[.] All 3 of them? Wire sent $125,009.63 invoice # 1786 $4779.13 invoice # 1807 $120,230.50."

January 28, 2020 at 11:19 am from the real Cole Huber: "Below is the email I sent to you in response to the phishing email you received, however I do not think you ever received it due to the way the phishing attack worked. We did not know it re routed emails until much later once our IT person fixed the problem."

November 7, 2019 at 2:34 pm from the real Cole Huber: "Guys, I just saw the email you replied to below 'from me' on Monday. That was not from me nor my actual email if you will look at the address it has construction misspelled . . . I have our IT dept looking into it, but please confirm any emails from me are from my actual email address. We have no offshore accounts, unfortunately . . . Sorry for any inconvenience, Thanks."

¶14 There are clearly disputed fact issues precluding summary judgment in favor of TMX. TMX states Revolution was the victim of a phishing email, but Revolution disputes this statement with emails from Cole Huber, who was the victim of the phishing email and who admitted that TMX's IT person had ultimately fixed the problem. But before then, when Huber attempted to notify Revolution by email that his email had been hacked, Revolution never received this notification before payment was sent about eight days later. The record does not show that TMX attempted to notify Revolution about the phishing email in an alternative manner such as by phone or letter.

¶15 Revolution admits it had been similarly hacked in February or March 2020. Josh Richardson testified that their customers notified them about suspicious wiring emails they had received from Revolution. Revolution then called its bank to stop any payments and fortunately no incorrect wires were sent. Questions of material fact remain as to who should bear the loss attributable to an unidentified hacker who illegally intercepted and stole funds meant for TMX. Given the disputed factual issues, the trial court was not in a position to grant summary judgment to TMX as a matter of law.

¶16 Addressing a similar issue in Beau Townsend Ford Lincoln, Inc. v. Don Hinds Ford, Inc., 759 Fed. Appx. 348 (6th Cir. 2018), the Sixth Circuit reversed the trial court's order granting summary judgment. In Beau, defendant agreed to buy 20 SUVs from plaintiff for $736,225. Id. at 349. But a hacker infiltrated plaintiff's email account and defendant's wire transfer went to the hacker, not to plaintiff. Id. The district court granted summary judgment in plaintiff's favor and determined defendant must pay plaintiff. Id. The appellate court found this decision to be improper because "the district court failed to adequately analyze this complex issue" of who should bear the loss in such a kerfuffle. Id. After analyzing two similar cases--Arrow Truck Sales, Inc. v. Top Quality Truck & Equipment, Inc., 2015 WL 4936272 (M.D. Fla. Aug. 18, 2015) and Bile v. RREMC, LLC, 2016 WL 4487864 (E.D. Va. Aug. 24, 2016)--the Sixth Circuit reversed the summary judgment concluding there must be a trial on the issue because material factual disputes existed. Id. at 359. It held:

The district court aptly observed that "[b]oth parties would each have the Court find that the other was in the best position to avoid the misfortune that occurred in this case." Beau Townsend, pointing to the suspicious nature of the wire instructions, says Don Hinds could have prevented the loss; Don Hinds, pointing to the fact that Beau Townsend's email was hacked, says the same about Beau Townsend. And both parties support their respective arguments with record evidence suggesting the other party was at fault.

No court can resolve these factual disputes at the summary judgment stage. Rather, the district court must hold a trial to decide whether and to what degree each party is responsible for the $730,000 loss in this case. Indeed, this was the approach taken by the courts in Arrow and Bile, both of which were decided after a bench trial. UCC Article 3, upon which both the Arrow and Bile courts relied, also suggests this question should be left to a factfinder: "No attempt is made to define particular conduct that will constitute 'failure to exercise ordinary care . . . .' Rather, 'ordinary care' is defined . . . in general terms. The question is left to the court or the jury for decision in light of the circumstances in the particular case . . . ."

Although the district court's error is understandable given the dearth of authority in this area, it is error nonetheless. To decide this case, the factfinder must determine which party "was in the best position to prevent the fraud." Arrow, 2015 WL 4936272, at * 6. To answer that question, there must necessarily be findings of fact. And to make findings of fact, the district court must hold a trial.

Id. at 358-59 (citations omitted).

¶17 Although it could be argued that Peeples v. Carolina Container, LLC, 4:19-cv-21-MLB, 2021 WL 4224009 (N.D. Ga. Sept. 16, 2021), an asset purchase agreement case also involving a fraudulent wire transfer, supports the position taken by the trial court here, it is distinguishable for several important reasons. First, unlike the present case, the parties' rights in Peeples were governed by an indemnification clause requiring defendant to reimburse plaintiff for any losses arising out of any "non-fulfilment of any . . . obligation to be performed" by the defendant. Id.*3. The Peeples decision by a federal trial court relied heavily on this fact in determining that the plaintiff's motion for summary judgment should be granted. Second, the Peeples court stated that no one in the case insisted that the rule in Beau, 759 Fed. Appx. at 357, controlled, i.e., that "losses attributable to fraud should be borne by the party in the best position to prevent the fraud." Peeples at *7. In fact, unlike our present case, the defendant adamantly insisted that it did not and the plaintiff urged it was "not necessary" to resolve his claims. Id. So the court declined to apply the rule. Third, unlike Peeples where only the plaintiff's email was hacked, here both parties at different times had experienced email hacking, facts which further bring into question who was in a better position to prevent the fraud. We found no line of cases following Peeples, and we decline to adopt its reasoning or conclusion for the reasons given.

¶18 After due consideration, we find the analysis in Beau to be persuasive. And as in the Beau case, disputed factual issues exist in this case precluding summary judgment. The judgment must be reversed and the case remanded for further proceedings.

CONCLUSION

¶19 Based on our review of the record and arguments presented, it was error to grant TMX's motion for summary judgment. The order is reversed and the case remanded to the trial court for further proceedings.

¶20 REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

HIXON, J. (sitting by designation), concurs, and BLACKWELL, J., dissents.

 

 

BLACKWELL, J., dissenting:

¶1 I respectfully dissent.

¶2 It is undisputed that the parties entered into a contract with the following, rather simple terms. The plaintiff was to complete work as directed by the defendant. The defendant was to pay the plaintiff upon completion of the work. It is undisputed that the plaintiff completed the work. It is further undisputed that the defendant utterly failed in its obligation to pay the plaintiff. Rather, the defendant fell victim to an email scam and paid an unrelated third party. The defendant attempts to excuse its failure to pay because it paid that third party "pursuant to the instructions it received from an email address it reasonably believed to be affiliated with Plaintiff." Doc. 2, Response to Motion for Summary Judgment, pg. 1 (emphasis supplied).

¶3 Even considering the facts in the light most favorable to the defendant, I do not believe any reasonable factfinder could determine that the defendant's payment to the third-party scammer was reasonable under the circumstances. First, the email the defendant claims to have reasonably relied on did not originate from the plaintiff or from the plaintiff's domain, but from the scammer's spoofed domain. This is evident on the face of the email, which came from "huberc@ tmxconstrcution.com" as opposed to Mr. Huber's actual address, which was apparently identical except that it spells "construction" correctly.[1] Second, the email itself requested payment to "our subsidiary offshore account" due to "an ongoing audit." The evidence suggests prior payments from the defendant to the plaintiff were by check. Finally, the record does not suggest that the defendant attempted to verify the legitimacy of the new, offshore account details or new method of payment in any way before wiring a six-figure sum pursuant to the new instructions. In my view, the record, even viewed in the light most favorable to the defendant, reveals that the defendant did not act reasonably under the circumstances and is not worthy of the equitable treatment it receives from the majority.

¶4 The rule the majority follows,[2] in effect, ignores fundamental precepts of contract law (e.g., strict liability for breach), inserts tort law concepts into a contract dispute (e.g., "the last clear chance" doctrine), and borrows from irrelevant areas of the law (e.g., UCC, Article 3 -- Negotiable Instruments). However, we are concerned here with contract law and "'[c]ontract liability is strict liability.'" Citgo Asphalt Ref. Co. v. Frescati Shipping Co., Ltd., ___ U.S. ___, 140 S. Ct. 1081, 1089, 206 L. Ed. 2d 391 (2020) (quoting Restatement (Second) of Contracts, pg. 309 (1979)). See also 23 Williston § 63:8, at 499 (2018) ("Liability for a breach of contract is, prima facie, strict liability."). And if we are to borrow from tort law, what of the doctrine of assumption of the risk? It was the defendant, after all, who ultimately chose to wire such a substantial payment under quite dubious circumstances and without any verification. Certainly, that payment cannot be said to have satisfied the defendant's contractual obligation to pay the plaintiff. The plaintiff should not be made to suffer due to the defendant's failure to take reasonable precautions with its own payment methods and procedures.

¶5 For these reasons, I would affirm the judgment entered in favor of the plaintiff.

FOOTNOTES

[1] The entirety of the initial fraudulent email was as follows:

[2] The majority relies primarily on Beau Townsend Ford Lincoln, Inc. v. Don Hinds Ford, Inc., 759 Fed. Appx. 348 (6th Cir. 2018). In my view, that case, and the cases on which it relies, were wrongly decided. A better template is Peeples v. Carolina Container, LLC, 4:19-CV-21-MLB, 2021 WL 4224009 (N.D. Ga. Sept. 16, 2021), which succinctly states the relevant law and, if followed, would lead to affirmance here.

The majority attempts to distinguish Peeples but, in my view, the differences between that case and ours actually make ours the easier of the two. For example, as the majority correctly notes, in Peeples, the parties' contractual rights were governed by an indemnification clause that required the defendant to "pay and reimburse [Plaintiff] for ... any and all Losses incurred or sustained by, or imposed upon, [Plaintiff] based upon, arising out of, with respect to or by reason of ... any breach or non-fulfillment of any covenant, agreement or obligation to be performed by [Defendant] pursuant to this Agreement." Id. at *3. Although the simple pay-for-services contract in our case apparently contains no such clause, it is unclear how this distinction works against our plaintiff. Second, the majority notes that the Peeples court declined to apply the rule that "losses attributable to the fraud should be borne by the party in the best position to prevent the fraud"--what that court calls "the imposter rule"--because no party "insist[ed] this rule controls ...." Id. at *7 (internal quotation marks omitted). However, the court did consider the possibility of such a rule and determined that, even if it had been invited to apply the rule, it was "not sure it would have done so," noting among other reasons, that the "approach is in tension with the concept of judicial restraint." Id. Finally, in full belt-and-suspenders fashion, the Peeples court noted that, even if the rule did apply it would still have found in favor of the defendant because, just as I conclude in this case, "[n]o reasonable jury could conclude" that the defendant was not "'the party in the best position to prevent the fraud.'" Id. at *8 (quoting Beau Townsend, 759 F. App'x at 357).

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2005 OK CIV APP 15, 108 P.3d 567, 
ROBERSON v. JEFFREY M. WALTNER, M.D., INC.
Discussed

 
2009 OK CIV APP 88, 223 P.3d 1024, 
KEELER v. GMAC GLOBAL RELOCATION SERVICES
Discussed

 
2011 OK CIV APP 64, 258 P.3d 1190, 
GURLEY-RODGERS v. BROOKHAVEN WEST CONDOMINIUM OWNERS' ASSOC., INC.
Discussed

 
2017 OK CIV APP 52, 404 P.3d 896, 
WEST v. JANE PHILLIPS MEMORIAL MEDICAL CENTER
Cited

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1989 OK 146, 782 P.2d 924, 60 OBJ 2833, 
Davis v. Leitner
Discussed

 
1993 OK 85, 859 P.2d 1081, 64 OBJ 2009, 
Kluver v. Weatherford Hosp. Authority
Discussed

 
2012 OK 49, 279 P.3d 788, 
RESIDENTIAL FUNDING REAL ESTATE HOLDINGS, LLC v. ADAMS
Discussed

 
2020 OK 5, 457 P.3d 1050, 
THE INSTITUTE FOR RESPONSIBLE ALCOHOL POLICY v. STATE ex rel. ALCOHOLIC BEVERAGE LAWS ENFORCEMENT COMM.
Discussed

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA